**MOY YEE MON and Moy Dot Mon, Plaintiffs,**

v.

**John Foster DULLES, Secretary of State, Defendant.**

**No. 14861.**

United States District Court  
E. D. Michigan, S. D.  
April 21, 1958.

Harry Kobel, Rosin & Kobel, Detroit, Mich., for plaintiffs.

Fred W. Kaess, U. S. Atty., Detroit, Mich., for defendant.

FREEMAN, District Judge.

This is a case brought under the provisions of § 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903,[1] asking that this court declare that the plaintiffs Moy Yee Mon and Moy Dot Mon are citizens of the United States. In their complaint, plaintiffs allege that they are the natural children of Moy Fook Mook, a native-born citizen of the United States, and that therefore, under the provisions of § 1993 of the Revised Statutes,[2] they are United States citizens. They allege that they were born in Kwongtun, China, the lawful issue of Moy Fook Mook and his wife Ng Tone Har. Plaintiffs have not previously been in the United States. On September 20, 1951, they submitted applications for United States passports, as citizens of the United States, to the United States Consulate at Hong Kong. It is alleged that these applications were held in abeyance by the United States Consulate until May 4, 1953, at which time plaintiffs were notified that said applications had been forwarded to the Department of State in Washington, D. C., for final decision. During the time the applications were held in abeyance, the plaintiffs were interviewed at least once by the consulate authorities on October 27, 1952. On June 16, 1953, the United States Consulate informed plaintiffs that a communication had been received from the Department of State advising that the passport applications had been disapproved.

Plaintiffs contend that the action of the United States Consulate in Hong Kong and the Department of State, in holding the applications for passports for approximately two years before denying said applications, constituted a denial of a right or privilege as a national of the United States by a department or agency of the United States, within the meaning of § 503 of the Nationality Act of 1940, Title 8 U.S.C. § 903, and therefore entitled them to bring the present action for declaration of nationality of the United States under that Act. Plaintiffs also contend that the savings clause provisions found in § 405(a) of the Immigration and Nationality Act of 1952 (8 U.S.C.A. § 1101 note), preserve their right to bring suit under § 503, Nationality Act of 1940, supra.

The defendant contends that there was no denial of such a right or privilege as a national of the United States until the final denial of plaintiffs' applications for passports in June, 1953. Defendant contends that the delay of the United States Consulate and the Department of State in processing these applications was no more than the normal administrative process in such cases and that such delay did not constitute a denial of a right or privilege as a national of the United States within the meaning of § 503, Nationality Act of 1940, supra. Defendant then shows that § 503, Nationality Act of 1940, was repealed by the Immigration and Nationality Act of 1952, effective December 24, 1952, and contends that from and after that date plaintiffs had no standing to sue in this court because of the repeal of the Nationality Act of 1940 and disputes plaintiffs' contention that § 405(a), Immigration and Nationality Act of 1952, preserves their right to sue under § 503, Nationality Act of 1940, stating that this clause was not intended to preserve the remedy provided in the Nationality Act of 1940, supra. Defendant also disputes as a fact that the plaintiffs in this cause are the natural sons of Moy Fook Mook and therefore contends that, even if this court should have jurisdiction of this case, the plaintiffs are not entitled to citizenship under § 1993, Revised Statutes (1878).

In order to determine if this court has jurisdiction of the subject matter of this suit, it is necessary to determine two questions: First, did the action of the United States Consulate and the Depart-

---

1. Now 8 U.S.C.A. § 1503.

2. Now 8 U.S.C.A. § 1431.

ment of State in delaying the consideration of these passport applications constitute a denial of a right or privilege as a national of the United States within the meaning of § 503, Nationality Act of 1940, supra? Second, do the savings clause provisions of § 405(a), Immigration and Nationality Act of 1952, supra, preserve plaintiffs' right to sue under § 503, Nationality Act of 1940, supra, in this court for a declaration of nationality of the United States, if they have in fact been denied a right or privilege as a national of the United States by a department or agency within the meaning of that Act?

■ It is clear to the court that the action of the Department of State and the United States Consulate in delaying a final determination of plaintiffs' passport applications for a period of twenty-one months constituted a denial of a right or privilege as a national of the United States within the meaning of the Nationality Act of 1940. § 503 of that Act provides, in part:

"If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency * * * in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States * * *."

The United States Court of Appeals for the Ninth Circuit has held in two cases that delay in processing an application for a passport constitutes a denial of a right or privilege as a national of the United States within the meaning of the above-quoted statute. In Chin Chuck Ming v. Dulles, 9 Cir., 1955, 225 F.2d 849, 852, the court said, "We construe the

words 'right or privilege as a national of the United States' of the first two lines of Section 503 to cover the right to a prompt disposition of a claimed citizen's application." In that case, the Department of State had delayed the final denial of an application for a passport for a period of fifteen months from the date of application. The court held that the district court should have jurisdiction of the case even though the final denial of the passport application did not occur until after the repeal of § 503, Nationality Act of 1940, supra, by the Immigration and Nationality Act of 1952, supra. In Dulles v. Quan Yoke Fong, 9 Cir., 1956, 237 F.2d 496, the court considered a case where the Department of State had delayed plaintiff's application for a passport from May 13, 1952, until January 6, 1953, only thirteen days after the repeal of § 503, Nationality Act of 1940, supra. The court held that this delay constituted a denial of a right or privilege as a national of the United States, even though the delay was only for a period of seven months. In the case at bar, the Department of State and the United States Consulate delayed the final determination on these applications for a period of twenty-one months, from September, 1951, until June, 1953. Such an inordinate period of time constitutes a denial of a right or privilege as a national of the United States within the meaning of § 503, Nationality Act of 1940, supra, as a matter of law. It is clear to the court that, if the Department of State should refuse to consider an application for a passport, such a refusal would be a denial of a right or privilege as a national of the United States. Therefore, if there is undue delay in consideration of an application, then this too must be considered a denial of a right or privilege, since unreasonable delay is equivalent to a refusal to consider. Therefore, the court holds that plaintiffs have been denied a right or privilege as nationals of the United States within the meaning of § 503, Nationality Act of 1940, supra.

■ Since this suit was filed after the repeal of § 503, Nationality Act of 1940,

supra, it is necessary for the court to determine if the plaintiffs' cause of action was preserved to them by the provisions of § 405(a), Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1101 note. This section provides, in part:

"Nothing contained in this Act, unless otherwise specifically provided therein, shall be construed to affect * * * any status, condition, right in process of acquisition, act, thing, liability, obligation, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all such prosecutions, suits, actions, proceedings, statutes, conditions, rights, acts, things, liabilities, obligations, or matters the statutes or parts of statutes repealed by this Act are, unless otherwise specifically provided therein, hereby continued in force and effect. * * *"

There is an apparent split of authority in the circuits as to whether or not the above-quoted section effectively preserves the jurisdiction of a United States District Court to hear causes of action arising under § 503, Nationality Act of 1940, supra, where such causes of action arose prior to the repeal of § 503, on December 24, 1952, but were not filed in court until after the repeal of that section.

In Matsuo v. Dulles, D.C.S.D.Cal.C.D. 1955, 133 F.Supp. 711, the court held that the savings clause provisions of § 405(a), Immigration and Nationality Act of 1952, supra, did not apply to causes of action arising under § 503, Nationality Act of 1940. The court stated that the plaintiff in that case did not contend that the repeal of § 503 left her without a remedy. The court then went on to say that, where the repealing statute only changes a remedy, then this does not take away any "right" from the plaintiff since she still had a forum, under the new Act, in which her case could be heard. The court said, at page 715: "There is no vested right in procedure which makes it immune to change by Congress. * * Section 405(a) preserved substantive rights and not procedural remedies. The

repeal of Section 503 deprived this court of jurisdiction to make a declaration of nationality in cases filed subsequent to the effective date of the repealing statute except as provided in Section 360 of the Immigration Act of 1952, 8 U.S.C.A. § 1503." This opinion by the district court was implicitly approved by the Court of Appeals for the Ninth Circuit in *dicta* contained in its opinion in Aure v. U. S., 9 Cir., 1955, 225 F.2d 88, 90. The court there held that a seaman had accrued a substantive right to become a naturalized citizen by virtue of his maritime service and that this right had been preserved to him by § 405(a) of the Immigration and Nationality Act of 1952, supra. Aure v. U. S., supra, was a naturalization proceeding and did not involve a suit for declaration of nationality of the United States. The court there said, "Unlike the situation in * * * Matsuo v. Dulles, supra, this was a substantive right and not merely a procedural remedy. His [plaintiff's] eligibility was a 'status' or 'condition' which he had gained under the prior law within the meaning of Section 405(a) and by reason of that savings clause it survived the repeal of the 1940 Act." From these opinions, the defendant in the case at bar argues that § 503 proceedings are not within the jurisdiction of this court if they were filed subsequent to the date of repeal of that section, since that section involves a "remedy" only and § 405(a) of the present Act is not intended to save remedies under the 1940 Act, but only "rights" arising under that Act and other prior legislation.

The United States Court of Appeals for the District of Columbia has not so viewed the operation and effect of § 405 (a), Immigration and Nationality Act of 1952, supra. In Wong Kay Suey v. Brownell, 1955, 97 U.S.App.D.C. 26, 227 F.2d 41, 42, the court considered the case of plaintiffs who brought actions under § 503 of the Nationality Act of 1940, supra, for declarations of nationality of the United States. The plaintiffs had entered the United States in 1952 and in 1954 they filed suit under the

928

above section praying for an injunction to restrain the Attorney General from interfering with their status as citizens, as well as for a declaration of nationality. The court there held that the plaintiffs' right to a declaration of nationality was preserved to them by the operation of § 405(a) of the Immigration and Nationality Act of 1952, since that Act preserved the jurisdiction of the court under § 503 of the 1940 Act. In referring to the language of § 405(a), the court said: "The general language in this savings clause is broad enough to cover the plaintiffs' rights, under the 1940 Act, to sue for declaratory judgments. * * * Congress can hardly have intended to preserve *only* rights 'in process of acquisition' and cut off rights fully acquired. Moreover, the savings clause is to be liberally interpreted. 'The whole development of this general savings clause * * * manifests a well-established congressional policy not to strip aliens of advantages gained under prior laws. The consistent broadening of the savings provision, particularly in its general terminology, indicates that this policy of preservation was intended to apply to matters both within and without the specific contemplation of Congress.' United States v. Menasche, 348 U.S. 528, 535, 75 S.Ct. 513, 518 [99 L.Ed. 615]." The court then went on to consider certain other phases of the particular exclusion proceedings involved in that case that are not pertinent to the case at bar. The court ultimately held that the savings clause provision preserved the plaintiff's rights under § 503, Nationality Act of 1940, supra. The court held in effect that, where a plaintiff has a matured right to sue for a declaratory judgment under § 503, Nationality Act of 1940, supra, prior to the repeal of that Act then the court will have jurisdiction of the subject matter of the case even if filed after the repeal of § 503.

In Matsuo v. Dulles, supra, the court held that, where Congress only changes a remedy, then the savings clause, § 405 (a), Immigration and Nationality Act of 1952, supra, does not preserve that prior remedy and therefore, on the facts of that case, the remedy provided in § 503, Nationality Act of 1940, supra, was not preserved. The court pointed out that the plaintiff did not contend that she had no other remedy.

It is apparent that there is a basic difference in approach between the decision of the Court of Appeals for the District of Columbia and the decision of the United States District Court in Matsuo v. Dulles, supra, in determining whether or not the savings clause provisions of § 405(a), Immigration and Nationality Act of 1952, preserve the jurisdiction of the court to hear a cause of action under § 503, Nationality Act of 1940, supra. Under the decisions in the Ninth Circuit, it is necessary to determine whether or not the plaintiff has been deprived of a "right" by the repeal of the Nationality Act of 1940. If he has, then the savings clause will preserve this "right" and the court will have jurisdiction of the subject matter. Under the decision in Wong Kay Suey v. Brownell, supra, decided by the Court of Appeals for the District of Columbia, it is necessary only to determine if the plaintiff had a matured cause of action prior to repeal of the 1940 Act. If he did, then the savings clause will be held to preserve jurisdiction of the court even though suit is filed after the date of repeal.

■ It is the opinion of the court in the case at bar that, under either the decision of the Court of Appeals for the District of Columbia or the cases in the Ninth Circuit, this court has jurisdiction of the subject matter of this case. In the case at bar, the plaintiffs have no other relief available to them than that provided by § 503. The plaintiffs have never been within the United States and therefore are not entitled to the protection of any of the provisions of § 1503, Title 8 U.S.C.A., Immigration and Nationality Act of 1952, as was the plaintiff in Matsuo v. Dulles, supra. That section provides remedies for persons who have been denied a right or privilege as a national of the United States under the present Act. Its provisions are applica-

ble only to persons who have been, or are now, in the United States. Congress has provided no alternative remedy for these plaintiffs. Since plaintiffs were entitled to bring an action under § 503 of the 1940 Act prior to its repeal for the reasons already stated, it is the opinion of this court that they had a "right" under the Nationality Act of 1940 to have their status as nationals of the United States declared by this court. The savings clause provision in § 405(a) of the 1952 Act preserves rights fully acquired under prior legislation. Wong Kay Suey v. Brownell, supra. The savings clause provisions of the 1952 Act are to be broadly construed. United States v. Menasche, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615. Under the decision in Matsuo v. Dulles, supra, where plaintiff has been deprived of a substantive right gained under the 1940 Act, the savings clause of the 1952 Act will preserve that right to him. Plaintiffs in the case at bar have no other relief available to them. Thus, it is apparent that the instant case can be reconciled with the decision in Matsuo v. Dulles, supra, since the repeal of the Nationality Act of 1940 has abolished all remedies available to these plaintiffs and has not merely changed the forum in which they may seek a remedy. Hence, in actual effect, the repeal would deprive plaintiffs of a substantive right gained under the prior legislation.

Therefore, it is the opinion of the court that plaintiffs have the right to a declaration of their nationality of the United States under the provisions of § 503 of the Nationality Act of 1940, as preserved by the savings clause found in § 405(a) of the Immigration and Nationality Act of 1952, supra, and this court has jurisdiction to make a declaration of nationality in this case.

The issue of fact for decision is whether plaintiffs are the sons of Moy Fook Mook, a native-born citizen of the United States. In support of their claim of such relationship, plaintiffs submitted the testimony of Moy Fook Mook, Moy Yick Mon and Wong Hoy Kot, his wife, the alleged father, brother and sister-in-law, respectively, of the plaintiffs, all of whom reside in Detroit. Plaintiffs also placed certain documentary proof in evidence.

Moy Fook Mook testified, in substance, that he is 70 years of age and was born in San Francisco; that he made four trips to China and on one of these occasions married Ng Tone Har in 1917 in Lung Hong Village; that he had four children by this marriage, namely, Moy Yick Mon (hereinafter referred to as Yick), a son, age 40, who came to the United States in 1933 and now lives in Detroit; Moy Git Mon (hereinafter referred to as Git), a son, age 37, who now lives in Hong Kong, and the plaintiffs, Moy Dot Mon (hereinafter referred to as Dot), age 30, and Moy Yee Mon (hereinafter also referred to as Yee), age 28; that his last trip to China was in 1926, where he stayed until some time in 1928, during which time the plaintiff Dot was born in Lung Hong Village in 1927; that the plaintiff Yee was born shortly after he returned to the United States on that occasion; that he has not seen his son Dot since 1928 and has never seen his son Yee; and that he had some letters from the plaintiffs Dot and Yee at his home which were not produced in evidence.

Moy Yick Mon, also a resident of Detroit, testified, in substance, that he was born in Lung Hong Village on January 16, 1919; that he was a son of Moy Fook Mook and Ng Tone Har; that he came to the United States in 1933; that he has three brothers, Git, Dot and Yee; that Moy Fook Mook was also the father of the plaintiffs; that he and his mother and brothers were all living together in the same house in Lung Hong Village, when he left China for the United States in 1933; that he took a one-year trip to China in 1947–8, during which time he lived in his mother's home in Lung Hong Village and on this occasion was married to Wong Hoy Kot on February 24, 1948, at the United States Consulate in Canton and that the plaintiffs have lived in Hong Kong since 1951.

Wong Hoy Kot, the wife of Yick, testified, in substance, that after her mar-

riage to Yick in 1948 she and her husband went to live in the home of her mother-in-law, Ng Tone Har, and that she remained there until she left for Hong Kong in 1933, where she resided until she came to the United States in 1954; that the plaintiff Dot also lived in the same house with his mother until he left for Hong Kong 'and that Yee often came there, although he lived in another city during that time; that the plaintiffs Dot and Yee referred to Ng Tone Har as their mother and she in turn referred to them as her sons.

Plaintiffs placed in evidence two family photographs, one allegedly taken in China in 1947, purportedly of the plaintiffs and Yick, and the other allegedly taken in 1950 or 1951, purportedly of the plaintiffs Dot and Yee, Ng Tone Har, Git and Yick's wife and son. The marriage certificate for Yick and Wong Hoy Kot, his wife, was also submitted in evidence.

Other documentary evidence submitted by plaintiffs included receipts for 28 checks and drafts in varying amounts aggregating $1,400, some payable to Dot and some to Yee, and also receipts for two checks payable to Ng Tone Har in the total amount of $150, all of these receipts indicating Moy Yick Mon as remitter of the funds, except for two checks sold to Moy Fook Mook. These checks were all issued in the years 1952 to 1957, inclusive, except none were issued in the year 1954. The passport file, hereinafter referred to, also contains photostat copies of two bank drafts drawn by a Detroit bank payable to Moy Dot Mon, one in the amount of $150 dated July 9, 1951, and the other in the amount of $500 dated September 11, 1951, and also contains photostat copies of two bank drafts drawn by the same bank payable to Moy Yee Mon bearing the same dates and amounts as those payable to Dot.

Plaintiffs also submitted in evidence 14 purchaser's receipts for money orders drawn on the Akron Savings and Loan Company of Akron, Ohio, in varying sums aggregating $1,128, bearing stamped dates from August, 1948, to October, 1950, which Yick testified represented funds sent to his mother and brothers in China, although the form of such receipts contains no such data.

The plaintiffs and their alleged mother were interviewed at the American Consulate in Hong Kong on October 27, 1952, in an effort to establish their alleged identity and relationship. The statements given by plaintiffs and their alleged mother on this occasion and certain documentary proof submitted at that time and subsequent thereto are contained in the passport file of plaintiffs, originating with their respective applications for passports executed September 20, 1951, at Hong Kong, wherein plaintiffs claim to be citizens of the United States by reason of their birth in China as the sons of an American citizen father, Moy Fook Mook. Both parties relied to some extent upon the contents of this passport file as evidence bearing upon the factual issue involved.

It should be noted that the passport file contains a sworn statement of Moy Fook Mook made to an officer of the Immigration and Naturalization Service in Detroit on October 12, 1933, in connection with proceedings had on the application of Yick for admission to the United States as a son of Moy Fook Mook, wherein the latter testified that he had four children, two of whom were Dot, age seven, and Yee, age five. The file also contains a sworn statement of Yick made to an officer of the Immigration and Naturalization Service at Detroit on July 29, 1937, in connection with his application for a return certificate to be used upon his return from a contemplated trip to China, wherein Yick testified that he had three brothers, Git, age nineteen; Dot, age eleven, and Yee, age nine.

Plaintiffs and their alleged parents submitted to blood type tests, the results of which were compatible with the alleged relationship. Photostat copies of uncertified income tax returns of Moy Fook Mook for the years 1942, 1943 and 1944 indicate that for the year 1942 the taxpayer had gross income of $700 and claimed a "wife and two sons in China"

as dependents, although their names were not set forth in the space provided for that information; that the 1943 return indicated a gross income of $990, the taxpayer claiming two sons as dependents whose names were listed as Zea Mon Mook and Arc Mook; and that the 1944 return indicated a gross income of $855, the taxpayer claiming two sons as dependents, listing the same names as set forth in the 1943 return.

A family photograph of plaintiffs' alleged mother, Git, Yick's wife, Wong Hoy Kot, and their child, allegedly taken in 1951, was also submitted.

Documentary evidence submitted at the interview and also at the trial of this case is of too recent origin to be of much probative value.

The plaintiffs Dot and Yee testified at the interview that Lung Hong Village was a village of about 100 houses made up of 21 rows of houses, the houses being about six feet apart and the rows being separated by a distance of about ten feet. They also testified that their home was the first of seven houses in the sixteenth row. Their alleged mother testified that there were only 21 houses in the village and that her home was the first house sixth row, and, when confronted with the testimony of Dot and Yee as to these matters, stated that she was mistaken and they were right.

Their testimony indicated an amazing lack of knowledge of their home village, where Dot claimed to have lived from birth in 1927 until he left for Hong Kong in 1951 and where Yee claimed to have resided from birth in 1929 until 1941, after which he asserted that he visited his home at least ten times each year until he and Dot went to Hong Kong in 1951 and where their mother allegedly lived during her entire married life, a period of thirty-five years. Dot did not know how many houses there were on the 14th, 15th and 17th rows of the village, stated that he had never been on any of these rows of houses and when asked to give the names of some of the people who lived on those rows, testified that he knew

the people by sight but not by name. He was also unable to state the names of any Lung Hong Village resident except those of the family in the second house, 16th row, next door to his alleged home. Yee was unable to give the names of any resident of his home village, not even the next door neighbor. The alleged mother testified that the only persons whose names she knew in the entire village were those of her next door neighbors who occupied the second house, 16th row. It is difficult to understand how three adult members of a family could live so many years in such a small village and be so ignorant of the neighborhood. Indeed, it is incredible and justified the conclusion reached by the American Vice Consul that "the joint residence and described village life have been fabricated for the purpose of providing a relationship which does not exist in fact."

It is also significant that plaintiffs produced no correspondence from their alleged father at the interview. There was no evidence to prove that the two sons listed on the alleged father's 1943 and 1944 income tax returns as "Yea Mon Mook" and "Arc Mook" were the same persons as the plaintiffs. There was no documentary proof in any form to establish the alleged marriage or subsequent husband and wife relationship of Moy Fook Mook and Ng Tone Har. Neither was there any documentary proof of the birth of plaintiffs or the alleged parent and child relationship, such as school records, church records or records in any other form usually available to establish such relationship. It is also interesting to note that Moy Fook Mook testified that his alleged wife had no desire to come to the United States and that he never asked her to come here.

After a careful consideration of all the evidence submitted at the hearing in this court and also at the interview at the American Consulate in Hong Kong and subsequent thereto as a part of the passport file, this court concludes that plaintiffs have not met the burden of proving the relationship in question by a

**932**

preponderance of the evidence as required in ordinary civil suits, which rule applies to the instant case. Fay v. Brownell, 9 Cir., 224 F.2d 717; Ly Shew v. Brownell, 9 Cir., 219 F.2d 413; Chow Sing v. Brownell, 9 Cir., 217 F.2d 140.

The court had the benefit of an excellent brief filed by counsel for plaintiffs, but was compelled to decide the case without any brief on behalf of the defendant. An appropriate form of judgment may be submitted dismissing the complaint.

