Per Curiam
: This is a suit by wage board employees of the Department of the Navy to recover overtime pay.
Plaintiffs were employed at the Mare Island Ammunition Depot Annex, Vallejo, California, but on the days for which overtime pay is claimed they were detailed to work at the United States Naval Ammunition Depot, Concord, California. Concord was approximately 25 miles from Mare Island and approximately one hour was required to travel between the two locations. When employees at Mare Island were scheduled for work at Concord, free Government transportation by bus was provided, but there was no requirement that it be utilized; employees were free to use their private automobiles if they so desired.
Plaintiffs’ normal workday began at 7:30 a.m., but when detailed to Concord their actual workday commenced at 8:30 a.m., although they were paid for the hour from 7:30 a.m. to 8:30 a.m. which was spent in travel. Plaintiffs worked until 4:15 p.m., at which time the normal workday was completed. Government transportation was again made available for travel back to Mare Island, the arrival time there being approximately 5:15 p.m.
Plaintiffs seek to recover overtime pay, as provided for by 5 U.S.C. § 913 (1958 Ed.), for the one hour travel time from Concord back to Mare Island after the close of the normal workday. This section provides that wage board employees shall be entitled to overtime pay in accordance with section 673c, which provides for overtime pay at not less than time and one-half.
We do not think they are entitled to recover. 5 U.S.C. § 912b (1958 Ed.), applicable to classified workers, provides for payment for travel time outside the usual hours of work on a regularly scheduled workday, only where such travel *547 involves wort enronte or is carried out under arduous conditions. While this statute does not apply to employees whose compensation is fixed by wage boards, the regulations of the Department of the Navy set up the same standards for wage board employees. (See Finding 8.) This regulation is sensible, and is binding on employees accepting employment after its promulgation. However, plaintiffs performed no work enroute home, nor was that travel under arduous conditions. Government transportation by bus was furnished, but plaintiffs were free to travel to and from work in their private automobiles, if they chose to do so. There was nothing arduous about it, at least no more so than travel on a crowded city bus, which countless employees do every day.
A somewhat similar question was before this court in Aheam v. United States, 142 Ct. Cl. 309, cert. denied, 364 U.S. 932. There plaintiffs, firefighters at the United States Naval Base at Newport, Bhode Island, claimed that time spent by travel in boats furnished by the Navy to and from island fire stations was “employment” under section 201 of the Federal Employees Pay Act of 1945, and was compensable as overtime. We held that it was not, stating at page 313:
We think the time spent in this travel is no more com-pensable than the time spent by any employee in going from his home to his work.
See also Post v. United States, 121 Ct. Cl. 94, 98-99; Sirmon v. Cron & Gracey Drilling Corp., 44 F. Supp. 29, 31; Dollar v. Caddo River Lbr. Co., 43 F. Supp. 822.
Plaintiffs are not entitled to recover. Their petition will be dismissed.
It is so ordered.
EINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner, C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs were at all times material herein employed by the Department of the Navy at the United States Naval Ammunition Depot-Concord with Mare Island Annex, Cali *548 fornia. Plaintiffs were wage board employees whose principal duties involved ammunition production work and handling.
2. On December 23, 1957, the Naval Ammunition Depot Mare Island, Vallejo, California, was consolidated with the Naval Magazine, Port Chicago, California, under a single command, and redesignated and renamed the United States Naval Ammunition Depot-Concord with Mare Island Annex. Prior to consolidation the Naval Ammunition Depot Mare Island was primarily a facility for renovation of gun ammunition although it had the capacity for assembly of new and complete rounds of ammunition. However, in 1957 the Bureau of Ordnance, Department of the Navy, began a new policy of assigning all new ammunition work to inland depots. This policy had its effect on the Mare Island Depot and production work there dropped to a point where it was impossible to achieve economical utilization of manpower and facilities. Conversely, the Naval Magazine Port Chicago was subjected to frequent periods of peak workload at the piers in accomplishing its mission of meeting ammunition transshipment demands of the Naval fleet. To meet manpower requirements during these periods of heavy ship loading, civilian personnel, trained in the rudiments of ammunition handling, were called upon to provide the necessary manpower reserve. By consolidating the Naval Ammunition Depot Mare Island and the Naval Magazine Port Chicago the Navy was able to generate the needed reserve manpower pool for periods of peak pier workload at Concord and at the same time stabilize the workload at the Mare Island Depot.
3. (a) It was evident that Concord would be assuming new missions of high priority and accordingly it was deemed advantageous to protect and maintain the highly skilled personnel at the Mare Island Depot for future reassignment to this area as the conventional ammunition work branched out at Concord.
(b) Prior to consolidation, a reduction in force of personnel at the Naval Magazine Port Chicago was effected. Production workers at Mare Island Depot were not subject to any reduction in force action despite the fact that pro *549 grammed workload at Mare Island would not support the labor force there. Maximum job protection to the production workers was assured from the outset of consolidation by having these workers commute to Concord as the workload shifted to that location.
4. To meet peak ship loading requirements at Concord and to assure that the maximum labor force of the Command was utilized, production workers from Mare Island were to be detailed on a rotational basis to Concord. Every effort was made to see that these work details would result in minimum hardships to Mare Island personnel. Several methods were considered in this regard. One method would be to periodically adjust the labor force at both locations and reassign Mare Island personnel to Concord. As both Mare Island and Concord were in the same commuting area, the employee would then, if he desired to remain employed by Concord, be required to travel on his own time and at his own expense to Concord and work a full eight hour day. This would have been the most economical method. Another method would be to detail personnel to Concord and pay mileage for travel by private conveyance. This would require the employee to travel on his own time and work a full eight hour day. Again, the tendency of the workers to commute by means of car pools would reduce the mileage payments required by this method.
5. (a) Prior to consolidation, the Naval Ammunition Depot, Mare Island and the Naval Magazine, Port Chicago, were separate commands. As a result, when plaintiffs and other employees similarly situated were assigned or detailed to work at Port Chicago, which was referred to as Concord, the assignments were accomplished on the basis of a loan of personnel by one command, Mare Island, to another command, Port Chicago. Accordingly, the personnel involved in these assignments traveled to and from the Concord area on Government time. For the convenience of the employees, Government transportation by bus was made available to and from the worksite at no cost to the employees.
(b) The assignment of Mare Island personnel to Concord for work details commenced around June 1957. When the matter of the assignment of work details to Concord *550 was brought to the attention of the Mare Island employees, a question was raised as to whether or not those assigned to these details were required to utilize the Government transportation by bus which was to be available, or whether they were to be permitted to utilize private transportation in proceeding to Concord when so detailed. The mode of travel was optional and the employees were allowed to utilize private transportation if they so desired. The only requirement was that they be at the worksite in Concord at the appointed time.
(c) During the period from June 1957 until around December 23, 1957, Mare Island personnel detailed to work at Concord worked for six hours at Concord and were paid for eight hours, two hours ostensibly being consumed in travel from Mare Island to Concord and return. During this period, personnel so detailed utilized the available Government transportation, or drove their own cars, or utilized both modes of travel — the mode of travel selected being made at the option and convenience of the individual employee. The above arrangement was most convenient for those detailed employees whose homes were located in and around the Concord area.
6. On December 20, 1957, a Memorandum for Record was posted for the benefit of Mare Island employees. This Memorandum stated in pertinent part as follows:
1. The question of an equitable arrangement that is mutually satisfactory to both NAD, Concord and the employee in the transportation from one activity to another, is not a recent one. It was given careful consideration when Mare Island personnel were first utilized at Concord earlier this year. NCPI 240 and NCPI 85 were not considered sufficiently explicit and advice was requested from the 12th Naval District. The reply indicated that since government transportation was provided both ways, that the employees should be expected to be present for a full eight productive work hours. Since this advice was not acceptable, a letter dated 3 October was sent by Port Chicago to BuOrd outlining the problem and requesting advice on the proposed plan.
2. Briefly, it was proposed that:
a. Government transportation would continue to be provided both ways in support of work schedules, however the employee would be present for seven work *551 hours. In other words one hour government time and one hour of the employees’ time would be utilized for travel.
b. In order to provide equal job protection to Mare Island employees, a combined retention register would be established..
3. The letter further stated that if the proposal was not acceptable to the Bureau or not endorsed by Mare Island employees, it was recommended that:
a. The present commuting area for retention purposes remain in effect, and;
b. Two separate retention registers be maintained by NAD Concord and as the workload reduced at Mare Island, the employees be reduced accordingly.
4. To date no reply to the above request has been received. It may be that BuOrd has referred the problem to OIB. or some other agency for a decision. In any event, lacking any definite guide in the matter the interim decision has been made that subsequent to the consolidation of the two activities, the first phase of the proposal will be put in effect.
5. While it is expected that the work load of the two stations will be more balanced after the consolidation and that less work for Mare Island employees at Concord is anticipated, it is not unreasonable to assume that some future work at Concord will be required. Accordingly, it is understandable that, lacking any formal resolution in the matter, an interim decision was mandatory.
6. It is realized at the command level that some personal inconvenience may result. However, in the interest of cooperative association in the matter of a mutual consolidation, the following action is strongly recommended :
a. Pending a formal resolution of the problem, expression of any dissension be withheld.
b. Employees involved maintain a record of their time involved in travel for any possible claim for future reimbursement.
c. All employees bear in mind that every work day performed at Concord means an additional backlog of work accumulating at Mare Island.
at * * ❖ *
7.(a) The method that was adopted following the consolidation provided that when teams of Mare Island production workers were required at Concord, a Navy bus, or buses, would be available for such transportation. The bus would leave Mare Island at 7:30 a.m. (the start of a normal work *552 day) and would leave Concord at 4:15 p.m. (the end of a normal work day). Concord was approximately 25 miles from the Mare Island Annex and approximately one hour was required to travel between the two locations. It was felt that free transportation to and from Concord and one hour travel time at Government expense was equitable and reasonable under the circumstances.
(b) Approximately 60 production workers were selected for detail work at Concord. These workers were rotated fairly and equitably. Some of the production workers volunteered to perform these details. To further assure that these workers received fair and equitable treatment, the following criteria were established to select production personnel for detail work at Concord:
(1) Distance of travel for commuters. Personnel required to travel great distances to Mare Island were not considered.
(2) Personnel living in the immediate vicinity of Concord were given preference.
(3) Personnel living in areas adjacent to Mare Island were selected by picking employees who rode together in car pools so there would be no hardship in arranging transportation from home to Mare Island Annex.
(4) The type of work to be performed (shiploading, segregation and preparation of ammunition for disposition) required that age, health and special skills be considered.
(5) Eetention of certain key personnel at the Mare Island Annex to provide for continuity of operation there.
(6) Leave schedules.
8. (a) Navy Civilian Personnel Instructions in effect prior to January 31,1958, provided in part as follows:
7-1 (d) Travel involving temporary duty away from, official duty station. — This Instruction is primarily concerned with travel involving duty of a temporary nature away from the employee’s official duty station. Section 204 of the Federal Employees Pay Act of 1945, as amended, provides that time spent in travel away from the official duty station shall be considered work time:—
(1) Within the days and hours of the regularly scheduled workweek, or
*553 (2) When the travel involves the performance of work while traveling, or
(3) When the travel is carried out under arduous conditions.
Determinations as to whether or not the travel involves the performance of work, or is carried out under arduous conditions, as well as determinations as to the number of hours that should be credited as work time are administrative ones that shall be made by local command. The determinations made should be conservative and well supported by fact. See NCPI 85.7-lg.
(b) On January 31,1958, these Instructions were amended to read in pertinent part as follows:
7-2 (b) Temporary duty work.- — Ordinarily, work at the temporary duty station will be credited according to the working hours scheduled at the activity at which the work is performed. If the travel to or from the temporary duty station is under extremely arduous conditions, the travel itself is creditable as work time without regard to the scheduled workweek of the traveler. Travel by pack train or dog sled over rough terrain in extreme weather may be considered arduous. Travel by bucket seat in an airplane; by bus, truck or by automobile over unimproved roads; or other travel that is uncomfortable or inconvenient is not to be considered arduous. Determination of whether the travel was actually arduous may be made by local command but must be made on a conservative basis.
(c) Regulations then in effect did not require the furnishing of the transportation or allowance for travel in this situation, but these procedures were adopted to provide the teams of Mare Island Annex employees working at Concord with the maximum benefits. In adopting this procedure, the Commanding Officer of the consolidated installations exercised his prerogatives outlined in NCPI 85-.7-la which provided:
If the employee performs travel outside the hours of his basic workweek at local administrative direction by use of locally available government conveyance, without the issuance of orders under the Travel Regulations and without the payment of per diem or other forms of reimbursement, the hours for which he is entitled to be paid are those determined by local command to be reasonable under the circumstances. * * *.
*554 9. (a) At the time of the consolidation in December 1957, a meeting was beld by the supervisory employees to discuss any changes that would affect the detailing of production workers to Concord as a result of the consolidation. The only change that was made operative was the fact that the production workers were to work until 4:15 p.m. instead of 3:15 p.m., while on detail at Concord. There was no other change in policy relative to these detail assignments and the production workers were free to utilize private transportation subsequent to consolidation as they were prior to consolidation.
(b) When employees at Mare Island were scheduled for detail at Concord, they were at liberty to utilize the free Government transportation which was made available or to travel via private vehicle as they saw fit. There were no restrictions on the use of private automobiles to effectuate this travel, and free Government transportation was made available only as a service to the employees. In some cases the buses as a convenience to some workers stopped en route to pick them up near their homes thereby obviating the employees a trip to Mare Island to pick up the bus.
(c) Two Government buses were sometimes involved. One bus transported the employees from the Mare Island Annex to the gate at the Concord installation. Another bus, or the same bus, then took the employees from the gate to the Concord work piers. The reverse procedure was followed when work terminated for the day. Because of the hazardous nature of the work at the Concord installation, automobiles and ordinary buses were not permitted on the installation proper but were required to discharge personnel at the gate or utilize a nearby parking lot. Special buses were then available for transportation within the installation proper. Those employees who utilized private transportation met those employees who rode the Government bus at a lunchroom outside the gate of the Concord installation and the entire detail then proceeded to the various worksites inside the installation.
10. Plaintiffs seek by the instant action to recover overtime compensation for time spent in travel outside the usual hours of work on a regularly scheduled workday. Their main con *555 tention appears to be that they were not allowed to utilize private transportation in traveling to and from Concord. Their claims are for travel performed subsequent to the consolidation on December 23, 1957, and are operative only on those days when plaintiffs were detailed to work at the Concord installation. The amount sought is equivalent to overtime pay for one hour which is the time required to travel from the Concord installation to the Mare Island Annex at the termination of the normal working day. As indicated previously, plaintiffs’ workday commenced at 7:30 a.m. When detailed to Concord, plaintiffs’ actual workday commenced at 8:30 a.m., since the hour from 7:30 to 8:30 a.m., was spent in travel at Government expense. Plaintiffs then worked until 4:15 p.m., at which time their normal workday was completed. Government transportation was again made available for travel back to the Mare Island Annex, arriving there at approximately 5:15 p.m. It is for the hour of travel from 4:15 to 5:15 p.m. that plaintiffs filed this claim.
11. The one hour travel time mentioned in the preceding finding did not involve the performance of work en route and was not carried out under arduous and emergent conditions. Plaintiffs were free to utilize private transportation had they desired to do so. Government transportation was made available but there was no requirement that it be utilized. All that was required was that employees be on the job at the proper time.
12. (a) Although the travel arrangements applicable to these work details to Concord were brought to the attention of the employees as early as December 20,1957, no complaint or grievance was registered relative thereto until about July 11,1958, when plaintiff O’Dell filed a claim with the Comptroller, United States Naval Ammunition Depot, Concord, California, seeking overtime compensation for the one hour travel time discussed in finding 10. Thereafter, plaintiff Tailback filed a similar claim. This claim was denied by the Commanding Officer on August 21, 1958. In denying the claim the Commanding Officer stated in part:
2. Prior to adopting the policy now in effect with respect to intra-activity transportation as outlined in reference (b), careful consideration was given not only to the plan’s fairness to the individual employees af *556 fected, but also to the needs of this Depot and to the economics involved. It was known that frequent work assignments at Naval Ammunition Depot, Concord would be required and the policy placed into effect was intended to result in a minimum of hardship to Annex personnel.
3. The Commanding Officer in formulating this policy exercised his prerogatives outlined in reference (c) which is quoted for your information:
“If the employee performs travel outside the hours of his basic workweek at local administrative direction by use of locally available government conveyance, without the issuance of orders under the Travel Regulations and without the payment of per diem or other forms of reimbursement, the hours for which he is entitled to be paid are those determined by local command to be reasonable under the circumstances.”
4. Based on the facts at hand and the policy expressed in references (b) and (c), your request for overtime compensation does not appear to warrant such payment and is therefore denied.
Apropos of the above discussion, plaintiff Hays, on April 22, 1958, wrote Congressman John Baldwin on behalf of 29 employees similarly situated complaining, inter alia, of the travel arrangements.
(b) Captain Elias B. Mott, the Commanding Officer of the consolidated installations from December 23, 1957, until July 1958, testified that he never received any complaints regarding the travel arrangements, nor were complaints received by the supervisors of these employees.
(c) Subsequent to November 1958, plaintiffs Jackson (#5), Railback (#8), Riley (#9), Schmidthans (#10), and Strange (#11) filed claims with the General Accounting Office seeking to recover overtime compensation for the travel time discussed herein. By settlement certificates of various dates, the Comptroller General of the United States denied the claims concluding as follows:
You were compensated at regular rates for the travel time from the Causeway to the Concord Depot, and it is your contention that you should receive overtime for the time spent on the return trip from the Depot to the Causeway at the end of the day.
The rule is well established that travel time outside the usual hours of work on a regularly scheduled workday, and not actually involving work enroute or carried *557 out under arduous and emergent conditions, does not entitle employees to overtime compensation. Since tbe time spent in returning to Mare Island did not actually involve tbe performance of work, payment of overtime compensation for such travel time is not authorized. See 24 Comp. Gen. 456,34 Id. 696.
13. As indicated in finding 10, plaintiffs seek compensation for one hour of travel time during each day they were detailed to work at Concord. The following schedule reflects the total number of hours spent in this travel during the period of the claim and the monetary value thereof:

CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and their petition is therefore dismissed.