### PORT HURON & SARNIA FERRY CO. v. LAWSON et al.

(District Court, E. D. Michigan, S. D.    August 6, 1923.)

No. 462.

**1. Customs duties ⟨⟩92—Regulations regarding unlading of passengers or effects at night or on Sundays or holidays held applicable to ferryboats between Canadian and United States ports.**

The provisions of Tariff Act 1922, tit. 4, §§ 450, 451, prohibiting the unlading of merchandise, passengers, or baggage from a foreign port on Sunday, a holiday, or at night except under special license, to obtain which requires the giving of a bond conditioned, inter alia, for payment of the extra compensation to which customs officers and employees are entitled by statute for work done at night or on Sundays or holidays, *held* applicable to passenger ferryboats operating regularly between Canadian and United States ports.

**2. Customs duties ⟨⟩2—Statute requiring payment of extra compensation of customs employees by owner of vessel unlading at night held not to impose unconstitutional tax.**

The requirement of Act Feb. 13, 1911, § 5, as amended by Act Feb. 7, 1920, that the extra compensation fixed thereunder for customs officers and employees for work done at night or on Sundays or holidays shall be paid to the collector by the master, owner, or consignee of a vessel unlading at such times under special license, *held* not to impose a direct tax in violation of article 1 of the Constitution, nor a tax for private purposes.

**3. Customs duties ⟨⟩2—Customs regulations held not in violation of treaty between United States and Great Britain.**

Statute making regulations respecting collection of customs duties, requiring special license for unlading on Sunday or holiday and the giving of a bond for fees, as applied to importations from Canada, *held* not in violation of the Jay Treaty of 1794 between the United States and Great Britain.

In Equity. Suit by the Port Huron & Sarnia Ferry Company against Richard I. Lawson, individually and as Collector of Customs, and others. Decree for defendants.

Miller, Canfield, Paddock & Stone, of Detroit, Mich., for plaintiff.

Earl J. Davis, U. S. Atty., and Frederic L. Eaton, Asst. U. S. Atty., both of Detroit, Mich., for defendants.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

TUTTLE, District Judge. [1] This suit, which is before the court for final decree on bill and answer and proofs taken thereon at the final hearing in open court, presents the question whether ferryboats operating regularly between Canada and the United States are subject to the federal statutory provisions regulating, in certain respects, the unlading of vessels to which such provisions apply. Plaintiff, which operates a line of such ferryboats, seeks by its bill herein to enjoin the defendants, the collector of customs for this district and one of his deputies, from compelling plaintiff to conform to the statutory requirements referred to. The term of the original defendant collector having expired after the filing of the bill, the suit has been revived against his successor in office in accordance with the statute applicable to such a case.

The statutory provisions involved are sections 450 and 451 of title 4 of the Tariff Act of 1922, being the Act of September 21, 1922, c. 356, 42 Statutes at Large, 954. Section 450 provides as follows:

"No merchandise, baggage, or passengers arriving in the United States from any foreign port or place, and no bonded merchandise or baggage being transported from one port to another, shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector under such regulations as the Secretary of the Treasury may prescribe."

Section 451 is as follows:

"Before any such special license to unlade shall be granted, the master, owner, or agent, of such vessel or vehicle shall be required to give a bond in a penal sum to be fixed by the collector conditioned to indemnify the United States for any loss or liability which might occur or be occasioned by reason of the granting of such special license and to pay the compensation and expenses of the customs officers and employees whose services are required in connection with such unlading at night, or on Sunday or a holiday in accordance with the provisions of section 5 of the act entitled 'An act to provide for the lading or unlading of vessels at night, the preliminary entry of vessels, and for other purposes,' approved February 13, 1911, as amended. In lieu of such bond the owner, or agent, of any vessel or vehicle or line of vessels or vehicles may execute a bond in a penal sum to be fixed by the Secretary of the Treasury to cover and include the issuance of special licenses for the unlading of vessels or vehicles belonging to such line for a period of one year from the date thereof."

Section 5 of the Act of February 13, 1911, c. 46, 36 Statutes at Large, 901, as amended by the Act of February 7, 1920, c. 61, 41 Statutes at Large, 402, the provisions of which are thus referred to and adopted by the terms of the section of the Tariff Act of 1922 just quoted, contains the following:

"The Secretary of the Treasury shall fix a reasonable rate of extra compensation for overtime services of inspectors, storekeepers, weighers, and other customs officers and employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian, or on Sundays or holidays, to perform services in connection with the lading or unlading of cargo, or the lading of cargo or merchandise for transportation in bond or for exportation in bond or for exportation with benefit of drawback, or in connection with the receiving or delivery of cargo on or from the wharf, or in connection with the unlading, receiving, or examination of passengers' baggage, such rates to be fixed

on the basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock postmeridian (but not to exceed two and one-half days' pay for the full period from five o'clock postmeridian to eight o'clock antemeridian), and two additional days' pay for Sunday or holiday duty. The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted, to the collector of customs, who shall pay the same to the several customs officers and employees entitled thereto according to the rates fixed therefor by the Secretary of the Treasury."

Various arguments are urged by plaintiff in support of its contentions, all of which are, in my opinion, without merit. It is earnestly insisted that Congress has at all times observed a clear distinction, with a consequent difference in the regulatory requirements adopted and applied, between vessels bringing cargoes of merchandise and vessels bringing passengers and their baggage to this country, and also between commerce with contiguous countries and that with other foreign countries. The case of International Railway Co. v. Davidson, 257 U. S. 506, 42 Sup. Ct. 179, 66 L. Ed. 341, is cited and relied on as controlling authority to the effect that the provisions of the Act of 1911 as amended by the Act of 1920, to which reference has been made, was intended to apply only to vessels carrying merchandise to this country. A careful examination, however, of the opinion and decision of the Supreme Court in that case, shows it to be clearly distinguishable from the present one. In its opinion, which was rendered prior to the enactment of the Tariff Act of 1922, here involved, the court reviewed and discussed the history and language of various statutes relating to customs administration (most of which were repealed by the 1922 statute just mentioned) and reached the conclusion that the statute there under consideration did not apply to the maintenance of a tollbridge or the operation thereon of a line of passenger trolley cars. The court first pointed out that the words "vessel or other conveyance," as used in the statute, were not appropriate to describe the plant of a tollbridge. The court then examined the entire Act of 1911, as amended by the Act of 1920, and expressed its opinion that the provisions for the payment for overtime services contained in section 5 of the act (hereinbefore quoted) must have been intended by Congress to refer only to the vessels for the immediate lading and unlading of whose cargoes special licenses might be issued under the first four sections of said act; that is, vessels or other conveyances "belonging to a line designated by the Secretary of the Treasury as a common carrier of bonded merchandise." As, however, these four sections were repealed by the 1922 statute in question, what was said by the court in that connection has no application to the present situation. This is equally true of the discussion of the court concerning the numerous other statutes dealing with the bringing of merchandise and baggage into this country. For example, attention was called to the fact that compliance with the special requirements affecting importation of merchandise from Canada necessarily involved delays, while the provisions concerning passengers' baggage were simpler and were designed to secure expeditious entry thereof; and it is argued by plaintiff here that

the same considerations apply to the present case. This contention, however, is disposed of by the observation that section 451 of the 1922 Tariff Act expressly provides that the owner or agent of any line of vessels or vehicles may execute the required bond to cover and include the issuance of special licenses for the unlading of vessels or vehicles belonging to such line for a period of one year from the date thereof. It would seem that this effectually removes any cause of delay which might otherwise arise in connection with the enforcement of these requirements.

The careful consideration which has been given to the many and comprehensive sections of the Tariff Act of September 21, 1922, discloses no reason to doubt that sections 450 and 451 hereinbefore quoted are plain and unambiguous and should be interpreted and given effect in accordance with their explicit language. Section 401 of the same title defines the word "vessel" as including "every description of watercraft or other contrivance used, or capable of being used, as a means of transportation in water or in water and in air." This language certainly applies to the ferryboats of the plaintiffs. The same section defines the word "night" to mean "the time from five o'clock postmeridian to 8 o'clock antemeridian." There is no vagueness nor uncertainty in the provision of section 450 that—

"No merchandise, baggage, or passengers arriving in the United States from any foreign port or place * * * shall be unladen from the carrying vessel or vehicle on Sunday, a holiday, or at night, except under special license granted by the collector."

The requirements of the next section, 451, concerning the necessary bond and license, are equally clear. Sections 642 and 643 of the same title specifically repeal more than 200 sections of the Revised Statutes as amended and numerous other acts and parts of acts then included among the Statutes at Large. Section 644 expressly repealed "all laws and parts of laws inconsistent with the provisions of this act." The ably presented arguments on behalf of the plaintiff to the effect that, in view of various other statutes, the sections of the Tariff Act already quoted must be regarded as intended to apply only to vessels carrying cargoes of merchandise alone and to vessels required to make entry, and not to be applicable to ferryboats such as those of the plaintiff, have been examined and considered, as have also the statutes thus referred to, with much care and with the thoughtful consideration which the importance of the subject and the commendable industry and ability of counsel deserve. With such arguments, however, for the reasons already pointed out, I am unable to agree. To uphold the contentions of plaintiff in this respect would, in my opinion, constitute an exercise of judicial legislation in which this court has neither the right nor the power to indulge, and would require a holding that although Congress had employed plain, positive, and easily understood language to express its intention, it had in reality intended something different, which it did not express. It is clear that the ferryboats of plaintiff are subject to the provisions of sections 450 and 451 of the Tariff Act of 1922, and the contentions of the government in this respect must be sustained.

[2] It is further urged by plaintiff that the effect of the legislation in question is to impose a direct tax without apportionment according to population, contrary to the second and ninth sections of article 1 of the federal Constitution. It is, however, manifest that any tax involved in this legislation is not a direct tax upon any specific property, but an excise tax upon the privilege of unlading in accordance with the special permission granted; and it is elementary that such an excise tax need not be apportioned according to population.

The contention that the effect of the statute is to impose a tax upon vessel owners for a private purpose, namely, for the benefit of the customs officers and employees whose services are required in connection with the special unlading thus permitted, is equally without merit. Under the terms of the statute, the compensation for such overtime services is not paid by the licensee to such officers or employees, but to the collector of customs, who pays the extra compensation, which has been fixed by the Secretary of the Treasury, to those entitled thereto, according to the rate so fixed. In substance and essence the recipient of the special license so granted indemnifies and reimburses the government for the additional liability and expense incurred by it by reason of the extra cost of granting this special license. The customs officials performing the overtime services required are employed by, and look for payment of their compensation to, the government, which, in turn, is thus reimbursed and saved harmless by the licensee. This does not render the purpose of the payment a private benefit, and Congress is well within its constitutional powers in making provision for such a transaction. In re River Rouge Condemnation Proceedings. (D. C.) 266 Fed. 105.

[3] Finally, it is said that the Jay Treaty of 1794 (8 Stat. 116) between the United States and Great Britain compels the construction of the statute contended for by plaintiff and forbids the threatened acts of the defendants, because that treaty gives the right to the citizens of both of the contracting countries "freely to pass and repass" into the respective countries, and provides that—

"All goods and merchandise whose importation into the United States shall not be wholly prohibited may freely, for the purpose of commerce, be carried into the same."

This treaty is, of course, one of the laws of the United States which, if inconsistent with the terms of the subsequently enacted legislation here involved, has been expressly repealed thereby, as already indicated. It is, however, to be noted that the treaty itself makes provision for the payment of customs duties upon the merchandise carried between the two countries, and it therefore impliedly and necessarily contemplates and recognizes the right on the part of each nation to make such rules and regulations as are reasonably required for the proper enforcement of its customs laws; and it certainly cannot be said that the regulations here in question are not of that character.

After full consideration of the pleadings, proofs, and arguments, I reach the conclusion that plaintiff is not entitled to the relief sought and that the bill must be dismissed for want of equity, and a final decree entered to that effect.