**Laurens L. DeLANO et al.**
v.
**The UNITED STATES.**
No. 35–63.

United States Court of Claims.
April 19, 1968.

Cowen, Chief Judge, dissented.

John I. Heise, Jr., Washington, D. C., attorney of record, for plaintiffs.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, REED, Justice (Ret.), sitting by designation, LARAMORE, DURFEE, DAVIS, COLLINS, and SKELTON, Judges.

## OPINION

COLLINS Judge.*

Plaintiffs, 12 inspectors of the Immigration and Naturalization Service, seek by this action to recover overtime compensation under the Act of March 2, 1931,[1] in addition to the overtime compensation which has been paid to them under that act for services performed as extra inspectors assisting in the examination of passengers on southbound trains entering the United States from Canada.

Pursuant to an agreement between the Delaware and Hudson Railroad and the United States Immigration and Naturalization Service (hereinafter "Immigration Service"), passengers and crews of trains arriving at Rouses Point are inspected by immigration officers while the train is en route between Montreal, Canada, and Rouses Point, New York. Rouses Point is a designated port of entry for aliens arriving in the United States.[2]

---

* This case was referred to Commissioner W. Ney Evans, pursuant to Rule 57(a), for findings of fact and recommended conclusion of law. The court agrees with both, and both, with added discussion, are made a part of this opinion.

1. Chapter 368, 46 Stat. 1467 (1931), as amended, 5 U.S.C. § 342c (1964).

2. All plaintiffs but one were stationed at Rouses Point during the periods for which they seek compensation. Plaintiff

Under the agreement described above, the railroad furnished the transportation for the immigration officers from Rouses Point to Windsor Station in Montreal, where the officers boarded the train bound for the United States.[3]

Two trains of the Delaware and Hudson Railroad are involved in these claims. Train No. 35 transported the officers to Montreal, while the southbound train from Montreal to the United States is Train No. 10. Train No. 35 has, throughout the period of these claims, left Rouses Point at about 4:30 p. m. and arrived in Montreal at about 5:45 p. m. Train No. 10 has left Montreal on schedules of 10:10 p. m. or 10:20 p. m., arriving at Rouses Point on schedules of 11:22 p. m. or 11:32 p. m.

Two immigration officers, as their regular daily duties, are assigned to conduct inspections on Delaware and Hudson Train No. 10. Those scheduled tours of duty run from 4 p. m. to 12 midnight. They travel northbound from Rouses Point to Montreal on Train No. 35 for the express purpose of catching Train No. 10 back to Rouses Point. There is usually an interval of 4 hours or more between the arrival in Montreal of Train No. 35 and the departure therefrom of Train No. 10. The officers board Train No. 10 shortly prior to departure and make their examinations of passengers en route to Rouses Point.

Additional officers are assigned to assist the two regularly assigned officers when the southbound trains are expected to carry more passengers than usual. Each of the plaintiffs in this action is an immigration officer who has been so assigned as an extra and who has been required to work after his regularly scheduled tour of duty.

On each occasion of the assignment of extra officers to assist with inspections, the officers regularly assigned were paid for a regular tour of duty, i. e., from 4 p. m. to 12 midnight.

Prior to March 1, 1960, the local officer-in-charge at Rouses Point issued written orders to plaintiffs to report for duty at Rouses Point at the departure time of the northbound train for Montreal, and they were paid overtime from 5 p. m. until the arrival of the southbound train in Rouses Point, or upon completion of the inspection of passengers, whichever was later.

On February 29, 1960, the Assistant Regional Commissioner of the Immigration Service issued to the District Director (in Buffalo, New York) the following directive calling for a change in the payment of overtime charges:

A review of inspection overtime charges for Buffalo District immigrant inspectors, who travel to Canada to inspect train passengers enroute to the United States, discloses that extra compensation under the Act of March 2, 1931 is charged for the time, outside of the basic work week, spent en route to the point where inspection begins in Canada by arrangement with the carrier. In addition, inspectors boarding trains at Rouses Point, New York claim roll-back time from the time they board the train at Rouses Point, New York to proceed to Canada.

There is no authority in the Act of March 2, 1931, nor in A.M. 2818, for paying extra compensation for travel to the point of inspection. Inspectors are entitled to make a claim for extra compensation from the time they are ordered to board the train at the point in Canada where inspection begins, plus any allowable roll-back time up to two hours, as covered in A.M. 2818.07, Section 7.

Your consideration is invited to the well established rule that travel time is not compensable as overtime work.

James W. Hudson was stationed at St. Albans, Vermont, which is also a designated port of entry for aliens.

3. A similar agreement between the Immigration Service and the Central Vermont Railway, Inc., provides inspection while the train is en route between Montreal and St. Albans.

Since the legal principle is identical, we will assume, in the opinion, that all plaintiffs were stationed at Rouses Point.

The Comptroller General has been consistent in rulings to this effect on numerous occasions. * * *

* * * * * *

Since the travel time under consideration does not involve actual work and is not performed under arduous conditions, we have no alternative but to advise that payment for the travel time in these circumstances cannot be made and should not be claimed in the future.

* * * * * *

As a result of this directive, plaintiffs were thereafter issued orders to report for duty in Montreal at time of train departure, 10:10 or 10:20 p. m., and were paid overtime for the period of time beginning 2 hours prior to departure from Montreal—not for the period beginning at 5 p. m.—and ending with the time of train release in Rouses Point.

Plaintiffs contend that the change in the method of computing overtime was invalid, and in this action they are suing for that additional overtime compensation from March 1, 1960, for the period between 5 p. m. and 2 hours before departure from Montreal.

To judge the validity of the change in overtime computation, we must examine the statutory and regulatory authority under which it was promulgated.

The basic statute governing overtime compensation for the Immigration Service, the Act of March 2, 1931, ch. 368, § 1, 46 Stat. 1467, as amended, 5 U.S.C. § 342c (1964), provides in pertinent part as follows:

§ 342c. Officers and employees; overtime services; extra compensation; length of working day.

The Attorney General shall fix a reasonable rate of extra compensation for overtime services of immigration officers and employees of the Immigration and Naturalization Service who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock ante-meridian, or on Sundays or holidays, to perform duties in connection with the examination and landing of passengers and crews of steamships, trains, airplanes, or other vehicles, arriving in the United States from a foreign port by water, land, or air, such rates to be fixed on a basis of one-half day's additional pay for each two hours or fraction thereof of at least one hour that the overtime extends beyond five o'clock postmeridian (but not to exceed two and one-half days' pay for the full period from five o'clock post-meridian to eight o'clock antemeridian) and two additional days' pay for Sunday and holiday duty; * * *

Thus, the statute delegates to the Attorney General the authority to fix a rate of overtime compensation. In a case construing a similar statute [4] directing the Secretary of the Treasury to "fix a reasonable rate of extra compensation for overtime services," it was held that the authority to fix a rate of overtime compensation also carried with it very broad discretion in determining what constitutes overtime services. Callahan v. United States, 122 F.2d 216 (D.C. Cir. 1941).

Pursuant to this delegation of authority to the Attorney General, the following regulations (in effect for all times here in issue) prescribing overtime compensation were promulgated as sections 7, 9, and 9a of Part 2818 of the Immigration Service's Administrative Manual:

*Section 7, Time on Duty Except Sundays and Holidays, Definition:* Time on duty primarily shall be the actual time spent on inspection. In addition, time shall also be allowed for remaining on duty, as follows: Where two hours or less intervene between completion of an immigration officer's basic hours and the expected or actual time of an arrival, the beginning of time on duty shall be the time at which the immigration officer's basic hours of work ceased: *Provided,* That where these ceased before 5 p. m., the begin-

---

4. Act of February 13, 1911, ch. 46, § 5, 36 Stat. 901, as amended, 19 U.S.C. § 267 (1964).

ning of time on duty shall be at 5 p. m. Where more than two hours so intervene, the beginning of time on duty shall be considered to be the time two hours before the time arrival is expected, but in no case earlier than 5 p. m. The ending time shall be the time at which the actual inspection was concluded, 8 a. m., or the beginning time of his next basic hours of duty, whichever is earliest. * * *

* * * * * *

*Section 9, Inspections Outside the United States, Inclusion:* Where at the request of carriers, immigration officers of the Immigration and Naturalization Service board conveyances destined to arrive in the United States, and perform inspection of passengers and crews while enroute, or where inspection is otherwise performed in Canada or Mexico at carrier's request, extra compensations shall be due hereunder at carriers' expense. Carriers which are inspected enroute need not be off-schedule when they arrive in order to permit billing, and time spent *at* the port of arrival may be considered as a part of time on duty. For example, a train is inspected on its trip from Canada to the United States. It leaves Canada at 8 p. m. and arrives in the United States at 9:15 p. m. Inspection is completed at 9:45 p. m., one-half hour after arriving on scheduled time. The billable period is from 6 p. m. to 9:45 p. m.

*Section 9a, Willingness of Carriers to Pay:* Billing is proper only where the carriers have agreed to these arrangements in preference to having all of the inspection performed at the port of entry, or where they otherwise benefit from such arangements.

We note at the outset that both the Act of March 2, 1931, and section 7 of the Manual stipulate that no overtime shall be paid for services rendered prior to 5 p. m. This explains why, prior to March 1, 1960, plaintiffs' overtime period commenced at 5 p. m. and why, in this action, plaintiffs do not seek overtime compensation for any period prior to 5 p. m. As to plaintiffs' entitlement to overtime compensation for the period between 5 p. m. and 2 hours prior to departure from Montreal at 10:10 or 10:20 p. m., we conclude that none of the above-cited regulations govern or are applicable to the situation existing here.

In section 7, the Attorney General has defined overtime services in terms of "time on duty." The basic premise of the section is that "[t]ime on duty primarily shall be the actual time spent on inspection." However, the section also allows overtime compensation for "remaining on duty" by providing that where more than 2 hours intervene between "completion of an immigration officer's basic hours and the expected or actual time of an arrival, * * * the beginning of time on duty shall be considered to be the time two hours before the time arrival is expected * * *." (This 2-hour allowance is often referred to as a "rollback" allowance.)

This section quite obviously contemplates the usual situation of an immigration officer who, after finishing his regular duty hours at an inspection station in the United States, remains on duty to await the arrival of a later train at that inspection station. One may speculate as to the considerations which might have led to the Attorney General's decision as expressed in section 7) to allow only a 2-hour rollback. If the interval between the completion of regular duty and the arrival of the new train is great, it is usually simple enough for the officer to leave the inspection station and go home to eat, or whatever else he may care to do, and still arrange to get back to the inspection station shortly before arrival time. The 2-hour rollback would ordinarily compensate the officer for any added inconvenience and would give him time to pick up his gear, get ready for the arrival, etc.

At any rate, section 7, concerned as it is with inspections at stations in the United States, gives no consideration to what constitutes time on duty for officers who, at the request of carriers, board trains outside the United States

after their regular duty hours in order to conduct inspections en route to the United States. Section 9 does deal specifically with this situation, but it still fails to answer the problem presented in the instant case. In providing that "extra compensations shall be due hereunder at carriers' expense," section 9 states only that "time spent *at* the port of arrival may be considered as a part of time on duty." The section gives an example of a situation in which a train leaves Canada at 8 p. m., arrives in the United States at 9:15 p. m., and inspection is completed at 9:45 p. m. In such a case, the section provides, "[t]he billable period is from 6 p. m. to 9:45 p. m."

Of course, the fact that time spent at the port of arrival in the United States "may be considered as a part of time on duty" does not mean that time spent in Canada prior to the arrival of the southbound train cannot be so considered. In other words, that language is permissive and does not prohibit what the plaintiffs are seeking.

The fact that the example in section 9 allows a 2-hour rollback from the time the Canadian train leaves is also inconclusive. The example only states that the train leaves Canada at 8 p. m., but it does not consider how or when the officers get to Canada. It is most likely directed to the usual situation in which the officers are free to choose a means of transportation to suit their own convenience and can arrange to arrive in Canada shortly before departure time of the southbound train. Had this been true for plaintiffs, they would clearly be covered by section 9. However, as will be explained in further detail, plaintiffs, having only one practical means of transportation available to them, traveled at the convenience of the railroad and arrived in Canada many hours before the departure of the southbound train. Section 9 does not purport to deal with such a situation, and thus it is silent as to the precise question before the court.

Therefore, we conclude that neither the basic statute nor the regulations of the Attorney General (sections 7 and 9 of the Immigration Service's Administrative Manual) explicitly or necessarily required the change in overtime computation and the resulting denial of overtime compensation for the time periods claimed by plaintiffs. The issue then narrows down to the question of whether the directive of the Assistant Regional Commissioner ordering such change was a reasonable interpretation of the statute and the regulations of the Attorney General. We conclude that it was not.

Of primary importance to our conclusion is the long-standing administrative construction given to this statute. One of the plaintiffs testified that he had been paid overtime under the old method of computation ever since he became an inspector at Rouses Point—October 1944. Thus, it is reasonable to assume that for over 15 years all interested parties (the Immigration Service, the railroad, and the officers) interpreted the overtime statute as treating officers in plaintiffs' positions as on duty from 5 p. m. until the release of southbound Train No. 10 at Rouses Point.

It is a well-established rule of statutory construction that courts pay great deference to an administrative construction consistently maintained by the agency charged with its administration. Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); Udall v. Tallman, 380 U.S. 1, 15, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); and Ganse v. United States, 376 F.2d 900, 904, 180 Ct.Cl. 183, 189 (1967). Where the contemporaneous administrative construction of a law is reasonable and not opposed to the language of the statute, it should be followed. Schellfeffer v. United States, 343 F.2d 936, 942, 170 Ct.Cl. 178, 187 (1965).

Since the Immigration Service, prior to 1960, had consistently read the Act of March 2, 1931, in the manner here contended for by plaintiffs, and since that construction was and is reasonable, the court will adhere to that construction.

A strong indication of the reasonableness of that construction is the fact that the railroad never challenged it, for un-

der section 9 it is the railroad which bears the ultimate cost of this arrangement.

Also, the railroad must have considered it to its benefit to have plaintiffs inspect en route from Canada to the United States because section 9a provides that "[b]illing is proper only where the carriers have agreed to these arrangements in preference to having all of the inspection performed at the port of entry, or where they otherwise benefit from such arrangements." This is relevant in terms of the overall position in which plaintiffs were placed. After a full day's work, usually ending at 4 p. m., plaintiffs were told they must go to Montreal, for the convenience of the railroad. It would not have been practical for plaintiffs to have driven there, since they would have had no way to get their cars back to Rouses Point. Therefore, plaintiffs traveled to Montreal by the only available means of transportation which would get them there in time—Train No. 35. As mentioned above, this train left Rouses Point at about 4:30 p .m. and arrived in Montreal at about 5:45 p. m. Thus, plaintiffs, having already put in a full day's work, found themselves traveling to Montreal for the benefit of, and at the convenience of, the railroad, with no alternative but to leave at 4:30 p. m.

These facts distinguish the instant case from the cases cited by defendant,[5] which hold that travel time alone, to and from work stations, does not entitle a Federal employee to overtime compensation. Travel time can usually be arranged to fit the employee's schedule and convenience, so that all that is involved is a loss of the actual time spent traveling, a loss which all commuters bear.

For plaintiffs, taking Train No. 35 and arriving in Montreal four or more hours before the arrival of the southbound train are duties practically inseparable from plaintiffs' inspection duty. The contemporaneous construction of the

agency treating plaintiffs as on duty from 5 p. m. seems very reasonable under the above set of facts. It is certainly entitled to more weight than the Assistant Regional Commissioner's 1960 directive, which abruptly overruled many years of operating under this construction and peremptorily directed that plaintiffs could no longer be paid for this time, even though there had been no change in the underlying facts or in plaintiffs' working conditions.

Further evidence of the reasonableness of the contemporaneous construction of the statute is the fact that customs inspectors stationed at Rouses Point, who departed for Montreal on the same train as plaintiffs and who performed inspectional services on the southbound trains just as plaintiffs did, were (and still are) paid overtime compensation beginning at 5 p. m. under the comparable Customs Service Act.[6] This court has often considered the analogy between the Immigration Service and the Customs Service and has concluded that the purpose of the 1931 Immigration Service Act, quoted supra, was to put immigration inspectors on equal footing with customs inspectors. Bishop v. United States, 355 F.2d 617, 620, 174 Ct.Cl. 31, 38 (1966).

In *Bishop*, the court (174 Ct.Cl. at 38–39, 355 F.2d at 621) quoted with approval a Senate Committee on Immigration Report on the 1931 act:

> One of the best reasons for favoring this legislation is that for many years the customs employees have had a similar overtime provision to that proposed in this bill, while the immigration officers working side by side with them in the performance of their duties have been, so far, discriminated against. [S.Rep.No.1720, 72d Cong., 1st Sess. (1931).]

We agree that this accurately states the purpose of the 1931 act. The relevant language of the Customs Service Act is almost identical to the language

---

5. Biggs v. United States, 287 F.2d 908, 152 Ct.Cl. 545 (1961) ; Ahearn v. United States, 142 Ct.Cl. 309 (1958).

6. Act of February 13, 1911, ch. 46, § 5, 36 Stat. 901, as amended, 19 U.S.C. § 267 (1964).

of the 1931 act in that it provides that the Secretary of the Treasury "shall fix a reasonable rate of extra compensation for overtime services of * * * employees who may be required to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian * * *." 19 U.S.C. § 267 (1964).

No reason has been suggested why this language should be interpreted one way for plaintiff-immigration officers and another way for similarly situated customs officers. That would defeat the purpose of the 1931 act. This consideration buttresses our conclusion that the original administrative interpretation was a reasonable one because it was consistent with the interpretation of the Customs Service Act.

Furthermore, the facts show that plaintiffs did perform certain duties prior to departure from Montreal. When called for overtime service, plaintiffs reported to headquarters at Rouses Point at about 4 p. m. to obtain their working equipment, update their alien "lookout" book, and familiarize themselves with current directives. On the northbound trip to Montreal, plaintiffs, like the regular immigration officers, were in uniform[7] and were available to answer any inquiries by passengers or Canadian officials relative to immigration matters. United States forms collected by Canadian officials were also turned over to plaintiffs during this trip northbound. After depositing their train bags at their office at the Montreal station, plaintiffs and the regular officers generally had dinner out, and then returned to the office and made themselves available to preinspect any passengers entering the United States on Train No. 10 and to answer any inquiries. This advance inspection in the station shortened the processing time required on board train and thus may have avoided the detention of the

train in Rouses Point pending completion of inspection, or at least shortened the time for such detention. We need not consider whether these duties were enough to have prevented an original determination by the Service that plaintiffs were not on duty. For our purposes, it is enough to note that these duties do affirm the reasonableness of the original and long-standing administrative interpretation that plaintiffs were on duty. See Zemel v. Rusk, supra, and Udall v. Tallman, supra.

A final important factor confirming the reasonableness of that original interpretation is the fact that the two regular immigration officers, whom plaintiffs assisted, were paid for a regular tour of duty; i. e., from 4 p. m. to 12 midnight. If the Immigration Service considered those officers in duty status, how could it not similarly consider plaintiffs? The plaintiffs followed the same schedule as the regular officers and did exactly the same work. The only difference between the two groups of officers is that generally plaintiffs had already worked a regular tour of duty, so they were in an overtime status in the performance of the duties at issue in this case.

In light of this fact, as well as the other factors mentioned supra, it is little wonder that for so many years everyone concerned—the Immigration Service, the railroad, and plaintiffs themselves—operated under the assumption that plaintiffs were in a duty status after 5 p. m. As stated throughout this opinion, that was a very reasonable interpretation of the Act of March 2, 1931, and of the regulations of the Attorney General.

■ In summary, we find that plaintiffs were in the performance of their duties during the period of time after 5 p. m. on each of the days involved in this action and were entitled to recover

---

7. Defendant complains that plaintiffs were not required to be in uniform. However, considering the fact that they were in uniform when they finished duty at 4 p. m. and had to be in uniform on the southbound train from Montreal, it is more reasonable to expect them to be in uniform the whole time than it is to expect them to make two unnecessary changes of clothes. At any rate, plaintiffs were in uniform because they considered themselves to be on duty.

overtime pay accordingly under the Act of March 2, 1931. In view of the long-standing and reasonable administrative interpretation to this effect prior to 1960, the 1960 directive of the Assistant Regional Commissioner, changing plaintiffs' duty status, was an invalid interpretation of the Act of March 2, 1931, and of the regulations of the Attorney General.

Liability having been decided, the parties have stipulated the following amount of recovery due each plaintiff for the period extending from March 1, 1960, to June 15, 1965 (the date of completion of the trial):

| | | |
|---|---|---|
| 1. | Laurens L. DeLano | $403.48 |
| 2. | Samuel M. Dickson | 619.60 |
| 3. | James W. Hudson | 304.72 |
| 4. | Wilbur A. Jennings | 686.08 |
| 5. | William Kodl | 813.44 |
| 6. | Emil J. Mayer | 460.24 |
| 7. | R. W. McPheeters | 467.28 |
| 8. | Truman O. Murray | 368.80 |
| 9. | John J. O'Loughlin | 588.72 |
| 10. | Russell G. Pilger | 489.44 |
| 11. | Leonard Roth, Jr. | 156.76 |
| 12. | Wilfred C. Viens | 333.20 |

The parties may resolve before the commissioner the question of whether any additional amounts are due by reason of continuing claim. Therefore, judgment is entered for plaintiffs with the determination of the amounts of recovery reserved for further proceedings under Rule 47(c).

COWEN, Chief Judge (dissenting):

I agree that there are both practical and equitable considerations which lend support to a decision in favor of the plaintiffs. However, I respectfully dissent, because I believe that, under the statutes and regulations as they presently exist, a holding for the plaintiffs is contrary to the law.

As the majority correctly points out, the Act of March 2, 1931, ch. 368, § 1, 46 Stat. 1467, as amended, 5 U.S.C. § 342c (1964), vests in the Attorney General a broad discretion to determine what constitutes overtime services. Callahan v. United States, 74 App.D.C. 281, 122 F.2d 216 (1941). There is also no question that the regulations involved here are valid regulations promulgated pursuant to the authority conferred by the Act of March 2, 1931. My disagreement with the majority is in respect to the scope and application of the regulations. The court holds that, while sections 7 and 9 of the regulations are generally applicable, they do not cover the period of time for which plaintiffs make claim. The opinion reasons that because neither section makes specific mention of the time preceding an en route inspection, the guidelines of those sections necessarily do not apply to the computation of overtime for that period. In my view, the guidelines of section 7, which delineate those periods which are to be given overtime treatment, are clearly applicable to *all* overtime computations, including those preceding and incidental to an en route inspection program.

**I**

To properly understand the application of sections 7 and 9, they should be examined in the context in which they were promulgated. Section 7 is the key provision in which are prescribed the guidelines for determining the kind of duty that is entitled to overtime compensation. The significance of section 9 is its incorporation of the section 7 guidelines and

its application by way of example of these provisions to the very problem we have before us. It will be helpful, for the purpose of convenient reference, to again quote the provisions of sections 7 and 9.

> *Section 7, Time on Duty Except Sundays and Holidays, Definition:* Time on duty primarily shall be the actual time spent on inspection. In addition, time shall also be allowed for remaining on duty, as follows: Where two hours or less intervene between completion of an immigration officer's basic hours and the expected or actual time of an arrival, the beginning of time on duty shall be the time at which the immigration officer's basic hours of work ceased: *Provided*, That where these ceased before 5 p. m., the beginning of time on duty shall be at 5 p. m. Where more than two hours so intervene, the beginning of time on duty shall be considered to be the time two hours before the time arrival is expected, but in no case earlier than 5 p. m. The ending time shall be the time at which the actual inspection was concluded, 8 a. m., or the beginning time of his next basic hours of duty, whichever is earliest. \* \* \*
>
> \* \* \* \* \* \*
>
> *Section 9, Inspections Outside the United States, Inclusion:* Where at the request of carriers, immigration officers of the Immigration and Naturalization Service board conveyances destined to arrive in the United States, and perform inspection of passengers and crews while enroute, or where inspection is otherwise performed in Canada or Mexico at carrier's request, extra compensations shall be due hereunder at carriers' expense. Carriers which are inspected enroute need not be off-schedule when they arrive in order to permit billing, and time spent *at* the port of arrival may be consid-

ered as a part of time on duty. For example, a train is inspected on its trip from Canada to the United States. It leaves Canada at 8 p. m. and arrives in the United States at 9:15 p. m. Inspection is completed at 9:45 p. m., one-half hour after arriving on scheduled time. The billable period is from 6 p. m. to 9:45 p. m.

These sections are contained in the Immigration and Naturalization Service's Administrative Manual and are but 2 of 22 sections, all of which deal as an unit with the matter of overtime compensation. It is these 22 sections which contain all the rules, regulations, and schedules regarding overtime for the entire Service; matters like the computation of and limitation on overtime earnings are all summarily dealt with in these provisions. Significantly, section 7 is the one provision which defines for the purpose of all the other sections what shall be considered time on duty *for the purpose of computing overtime.*[1] I point this out to suggest that, as a practical matter, since section 7 is the only regulation which contains the guidelines for measuring overtime employment, it would seem fair to conclude that the section provides the proper and only measure of overtime under all circumstances. Moreover, since time on duty is an integral part of any computation of overtime, and since section 7 provides the only definition of "time on duty" for the purpose of overtime, it is difficult to imagine how the provisions of that section could escape consideration whenever compensable overtime is being computed.

The majority concludes that section 7 contemplates only the situation where an inspector remains on duty at an inspection station, and, since it fails to make express mention of en route inspection, does not apply to the en route procedure. Arguably, the "an arrival" language in

---

1. It is important to note that section 7 does not provide a standard by which to determine what generally constitutes time on duty. Rather, it provides a formula for determining time on duty for the limited purposes of computing overtime. This distinction is important and discussion will later return to it, for it explains how an employee might seemingly be on duty after the expiration of his regular working hours and nonetheless be ineligible for overtime compensation.

section 7 could be interpreted as limiting the regulation to station inspections alone; however, since the vast majority of all inspections are undoubtedly conducted at the port of arrival, it would seem no more than a natural expedient to couch the regulation in the conventional terms of general procedure. To me, "an arrival" simply stands for the commencement of an inspection period. Moreover, it would seem unreasonable to conclude that the Attorney General would promulgate for an agency an exhaustive body of provisions to regulate the entire field of overtime and then limit, as the majority suggests he intended, his definition of overtime duty to employment at the port of entry alone, leaving unregulated all other types of inspection activity.

Fortunately, there is little need to speculate over the scope of the intended application of section 7 guidelines, for I think section 9 is dispositive of the matter.

The purpose of section 9 is to assign liability to carriers for overtime accumulated by inspectors during enroute inspections made at the carriers' request. For our purposes, however, the section establishes two important points. First, it quite obviously indicates that immigration inspectors are entitled to overtime compensation for the time they spend on duty during an en route inspection. Second, and most importantly, it illustrates, in contradistinction to the majority holding, that section 7 guidelines are applicable to en route inspection matters. This is clear from the example used to illustrate the boundaries of a "billable period." Starting with the requirement of section 9 that the carrier pay for *all* overtime compensation accumulated incidental to a requested en route inspection,[2] the example indicates that the inspectors have earned and therefore are entitled only to overtime pay for the period of

actual time spent on inspection (8 p. m. to 9:45 p. m.) plus a 2-hour rollback (8 p. m. to 6 p. m.). The example has necessarily adopted the requirements of section 7, for that is the only provision which delineates compensable overtime as "actual time spent on inspection" and provides, in addition, for a 2-hour rollback. That the Attorney General applied the guidelines of section 7 to an en route problem without further discussion is, to me, conclusive evidence that section 7 provisions are generally applicable to all overtime computation matters, including, of course, en route inspections.

Since section 7 contains the exclusive definition of what constitutes time on duty for the purpose of computing overtime, plaintiffs have no ground on which to recover, because the period for which they claim overtime compensation (5 p. m. to sometime shortly after 8 p. m.) was neither time spent at inspection nor within the 2-hour rollback period. That they spent part of the disputed time traveling to and waiting for their en route inspection is largely irrelevant, for that time nonetheless fell outside the section 7 definitions of compensable overtime. Once it is determined that section 7 guidelines apply to en route inspections—and section 9 would seem to make that clear—plaintiffs' claim is little different from that of an inspector who, after his regular tour of duty concluded at 5 p. m., waited at a port of entry until approximately 10 p. m. for the next arrival. There is no question but that the inspector in that situation would be entitled to overtime compensation only for the time he spent on inspection after 10 p. m. in addition to a 2-hour rollback to 8 p. m.

Plaintiffs contend that they did more than merely travel to and wait at the Montreal station and that they were actually on duty during the period for which they claim. They emphasize the

2. That the carrier is liable for all overtime accumulated incidental to inspection of its passengers after 5 p. m., see generally Mellon v. Minneapolis, St. P. & S.S.M. Ry. Co., 56 App.D.C. 160, 11 F.2d 332, cert. den. 271 U.S. 678, 46 S.Ct. 630, 70 L.Ed. 1147 (1926); Port Huron & Sarnia Ferry Co. v. Lawson, 292 F. 216 (E.D.Mich.1923); United States v. Central Vt. Ry., Inc., 16 F.Supp. 864 (D. Vt.1936).

fact that they were in uniform during the travel to Montreal and that they occasionally answered inquiries from passengers and Canadian officials. In addition, they show that they generally returned to the railroad station before the scheduled departure. The undisputed evidence shows that none of these activities was ordered or required. The orders issued to plaintiffs specified only that they were to report at the railroad station at the scheduled time for the departure of the southbound train to the United States. In the disputed period between 5 p. m. and the scheduled time for the departure of the southbound train (usually 10:10 p. m.), plaintiffs were in fact free to spend that time as they chose. As good public servants, plaintiffs are to be commended for their gratuitous answering of questions on the trip from Rouses Point to Montreal and for voluntarily returning to the railroad station in Montreal well in advance of the time the southbound train left for Rouses Point. However, their testimony on cross-examination demonstrates conclusively that these activities were performed at their volition. Since they were not engaged in the performance of compensable overtime service between 5 p. m. and 2 hours prior to the train departure, I would strike the court's finding 6(a). Their conduct in the circumstances is comparable for example, to that of a police officer who reports early to the station house to take care of administrative matters which would otherwise burden his patrol time, and, who, when proceeding to or after leaving from his duty station, takes the trouble to answer inquiries of pedestrians and motorists.

It is important to note that even if the plaintiffs, for some purposes, could be regarded as being on duty during the period between 5 p. m. and 10 p. m. they would still be ineligible for overtime compensation under the provisions of section 7. When that section is read carefully, it is clear that an employee is not necessarily entitled to overtime compensation even though he remains on duty after his regular tour. Section 7 carefully provides that the employee will be entitled to extra pay for "actual time spent on inspection", and, in addition to that, for the purposes of overtime compensation "time shall also be allowed for *remaining on duty*, as follows: * * * Where more than two hours so intervene [between the time at which the officer's basic hours of work ceased and the next inspection period], the beginning of the time on duty shall be *considered* to be the time two hours before the time of arrival * *" [emphasis added]. I call attention to the italicized words and suggest that, properly interpreted, the regulation provides that when an employee remains on duty for several hours after the expiration of his basic work period, he nonetheless is entitled to overtime compensation only for the subsequent inspection period and the two hours preceding that inspection. Were the plaintiffs regarded as being on duty for the period between 5 p. m. and 10 p. m., it might perhaps be argued that they should at least receive regular pay for the time they spent in excess of their basic work period but prior to the beginning of the 2-hour rollback period (i. e., roughly between 5 p. m. and 8 p. m.), but this is not an issue now before the court. I find only that the plaintiffs are not entitled to overtime compensation for the disputed period under the existing regulations.

Finally, there is good judicial support for the position I have taken. Interestingly, section 9(b) of the Service regulations, entitled "References", indicates that the provisions of section 9 are based, in part, on the case of United States v. Central Vt. Ry., Inc., 16 F.Supp. 864 (D. Vt.1936). In that case, the United States sought to recover from the railroad, under a statute similar in terms to section 9, compensation for the overtime earned by its inspectors during en route inspections between Canada and the United States. Notably, the inspectors there, like the plaintiffs before us, commonly traveled from the port of entry, St. Albans, Vermont, to Montreal and there boarded the southboard train to begin

the inspection program. The district court held that the United States was entitled to recover, but what I find significant is the fact that though the carrier was held liable for the full overtime, compensation due the inspectors, recovery was limited to the time spent on actual inspection. Admittedly, there was no claim made, as here, for overtime compensation for the travel period to Montreal; however, unless the regular pay period of each inspector ended the moment he boarded the southbound train and not before—a dubious supposition—it is clear that neither the United States, the employees, nor the district court thought the inspectors were entitled to overtime pay for travel to the site of an en route inspection. Coincidentally, the example in section 9 also involves an en route inspection between Canada and the United States. Since my observations here are equally applicable to that illustration, it would seem that if the travel and wait preceding an en route inspection represented compensable overtime, as plaintiffs argue, then that example would be fatally incomplete.

## II

The court holds that neither section 7 ncr 9 is applicable to the period for which plaintiffs make claim and that they are entitled to recover for that time directly under the authority of the Act of March 2, 1931, supra. To support this conclusion, the opinion points out that such an interpretation is consistent with a long history of administrative construction and parallels the treatment given customs inspectors whose overtime compensation is regulated under a similar statute.

It is true that the plaintiffs' counterparts in the Customs Service do get overtime compensation for the period here in issue. It is also true that we have before noted the practices of the Customs Service as an important anal-

ogical aid in the disposition of immigration matters and have concluded that the purpose of the 1931 Act was to put immigration inspectors on a parity with customs inspectors. Bishop v. United States, 355 F.2d 617, 620, 174 Ct.Cl. 31, 38 (1966). Moreover, the language in the Act which gives the Attorney General authority to fix reasonable overtime rates is practically identical to the language in the Customs Service Act (Act of Feb. 13, 1911, ch. 46, § 5, 36 Stat. 901, as amended, 19 U.S.C. § 267, (1964)) which vests the Secretary of the Treasury with the same authority.

However, the decisive difference between the two services is that different regulations govern the overtime compensation payable to the respective employees.[3]

To ignore the difference between the regulations of the two departments is to ignore the fact that, although a certain degree of parity was intended, Congress chose to vest the Secretary of the Treasury and the Attorney General, respectively, with the authority to independently exercise their discretion in defining compensable overtime.

The rule of statutory construction, which relies on long continued and consistent administrative interpretation, is not, in my opinion, applicable under the facts of this case. Before March 1, 1960, the local officer-in-charge at Rouses Point issued written orders for the inspectors to report for duty at Rouses Point, at departure time for the northbound train to Montreal. As a result, the inspectors (not on regular tour of duty) were paid overtime compensation from 5 p. m. until the southbound train from Montreal arrived back at Rouses Point about 11:30 p. m. On February 29, 1960, the Assistant Regional Commissioner determined that there was no authority in the Act of March 2, 1931, or in the regu-

3. The customs regulations provide, inter alia, that if more than 2 hours intervene between periods of actual service, the collector has the discretion to determine *according to the circumstances of the case* whether the service will be treated as continuous with compensable waiting time or as two separate assignments, 19 C.F.R. 24.16(f) [emphasis added]; in addition, customs inspectors are given the benefit of a 4-hour rollback, 19 C.F.R. 24.16(g).

lations for paying the inspectors any overtime compensation for travel to the point of inspection or for any waiting time prior to the beginning of their inspection duties, except for the 2-hour rollback time. Thereafter, the plaintiffs were ordered to report for duty at Montreal at train departure time (10:10 or 10:20 p .m.), and were paid for the actual inspection time on the southbound trip, as well as for the 2 hours earlier. I think the Assistant Regional Commissioner correctly concluded that the practice followed prior to March 1, 1960, was contrary to the applicable regulations. Therefore, I would place no reliance on a repudiated and erroneous construction of the regulations. County of Marin v. United States, 356 U.S. 412, 420, 78 S. Ct. 880, 2 L.Ed.2d 879 (1958).

### III

The case law is clear that Government employees are simply not entitled to overtime compensation for time spent in travel to a duty station or for waiting at or around the duty station until services are scheduled to commence. Therefore, the regulations here in issue do not produce an unlawful result when applied to plaintiffs.

The claimants suggest that because their waiting period was confined to Montreal, away from their homes and headquarters at Rouses Point, they were necessarily on duty status. In a case very much in point on this issue, Baca v. United States, 150 Ct.Cl. 70, cert. den. 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960), this court held that civilian bus drivers, who were employed by the Army to transport personnel between the White Sands Missile Range and their homes in the surrounding area, were not entitled to overtime compensation for the time they had to spend in waiting at the Range between their morning and afternoon transport duties, notwithstanding the fact that the isolation of the Range and the lack of any practicable means of leaving the post left the employees with no choice but to remain there. The court noted that—

* * * time spent while waiting to perform actual labor constitutes working time under some circumstances and, therefore, is compensable. However, it is characteristic of the cases so holding that they involved situations where the employee was under orders from the employer to wait at a particular place, the employee was liable to be called upon at any moment for the performance of actual labor, and he was not at liberty to go away for the purpose of engaging in other activities of his own choice. Armour & Co. v. Wantock, 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944); Farley v. United States, 131 Ct.Cl. 776, 779 (1955); see Missouri, K. & T. Ry. Co. v. United States, 231 U.S. 112, 119, 34 S.Ct. 26, 58 L.Ed. 144 (1913). In other words, waiting time is working time only if the employee has been "engaged to wait." Skidmore v. Swift & Co., 323 U.S. 134, 137, 65 S.Ct. 161 (1944). It necessarily follows that in a situation where an employee has complete freedom during a waiting period to go where he pleases and do what he pleases, so long as he is at the proper place when the time arrives for the beginning of his actual labor, the waiting time is not working time, and is not compensable. Abbott v. United States, 138 Ct.Cl. 459, 464, 161 F.Supp. 929 (1957). [150 Ct.Cl. at 77–78]

Similarly, this court has also found travel to duty posts noncompensable as overtime. In my view, the court has failed to distinguish Biggs v. United States, 152 Ct.Cl. 545, 287 F.2d 908 (1961) and Ahearn v. United States, 142 Ct.Cl. 309 (1958). The court suggests that the plaintiffs are entitled to compensation for travel because Train No. 35 was the only available means of transportation which would get them to Montreal in time, and passage thereon required them to leave their homes considerably earlier than would otherwise be necessary. Since under the *Baca* decision waiting time— even under confining conditions—is not compensable, it would seem irrelevant that plaintiffs had to arrive early in

Montreal, and, under the authority of *Ahearn*, relied upon in part by *Biggs*, it is immaterial that employees are required to travel on a particular conveyance. In *Ahearn*, plaintiff-firefighters, employed at the United States Naval Base, Newport, Rhode Island, had to spend a total of one hour each day traveling by boat to and from their stations. In denying plaintiffs' claim for overtime compensation for the travel time, this court held that—

> * * * The trip here * * * was made before reporting for work; it was not required by defendant, *although it was the only way they could get there,* and it involved no more risk than the travel to and from work performed by any employee. * * * We think the time spent in this travel is no more compensable than the time spent by any employee in going from his home to his work. [142 Ct.Cl., at 313] [emphasis added].

In the matter before us, the regular employees were employed from 4 p. m. in the afternoon to 12 midnight, and, consequently, they were on regular working hours during their trip to Canada and therefore properly entitled to compensation. The plaintiffs, on the other hand, were not on their regular duty tour during this period and therefore, under the statute, regulations, and case law, were not entitled to overtime. The apparent inequity with this arrangement is that both the regular employees and the plaintiffs were engaged in exactly the same activity while only the regular employees were compensated for their waiting and travel time; however, this is not entirely correct. Section 7 provides for overtime compensation during a 2-hour rollback period. This rollback quite obviously, by its very terms, represents compensation for a period *in excess* of "time on duty" which is defined in section 7 as "primarily * * * actual time spent on inspection." Moreover, it is apparent that the Attorney General provided for the rollback to cover exigencies just such as that presented in this case—that is, to provide compensation for overtime employees who must either wait for "an arrival" or travel to the site of the inspection before they can begin their "actual time spent on inspection" and receive credit for "time on duty." Under the circumstances of this case, the 2-hour rollback provision has the effect of putting the overtime employees more nearly on parity with the regular employees for the period before actual inspection begins. It must be remembered that overtime compensation, in this case, is twice the ordinary compensation, and the 2-hour rollback therefore provides the equivalent of 4 hours of regular-pay compensation. Here then, the plaintiffs, who were not ordered to report for duty until at or about 10 p. m., received compensation equivalent to the regular rate for 4 hours during the waiting period between 5 p. m. and 10 p. m. in contrast to the regular employees who *were* assigned to duty during this period and received ordinary compensation for 5 hours during the same interval. Once the plaintiffs began their duties at 10 p. m., they began earning their overtime pay at a rate twice that of the regular employees. Clearly, they received more than the regular employees for their entire evening's work.

We may think it an unwise and unfortunate policy to deny the immigration inspectors the overtime compensation granted to their counterparts in the Customs Service. However, the right to change that policy rests with the Attorney General in whom Congress has vested authority to determine the extent to which waiting time spent by immigration inspectors is to be compensated at the statutory overtime rates. Since I have concluded that the regulations constitute a reasonable exercise of the discretion granted to the Attorney General and that such regulations are applicable under the facts of this case, I would hold that plaintiffs are not entitled to recover.

## FINDINGS OF FACT

The court, having considered the evidence, the report of Trial Commissioner

W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:

1. (a) Rouses Point, New York, is a designated port of entry for aliens arriving in the United States by means of travel other than aircraft.[1]

(b) Pursuant to agreement between the Delaware and Hudson Railroad and the United States Immigration and Naturalization Service (hereinafter Immigration Service), passengers and crews of trains arriving at Rouses Point are inspected by immigration officers while the train is en route between Montreal and Rouses Point.[2]

2. (a) Under the agreement described in finding 1(b), the Delaware and Hudson Railroad furnished the transportation for the immigration officers from Rouses Point, New York, to Windsor Station in Montreal, Canada, where the officers boarded the train bound for the United States.[3]

(b) Two trains of the Delaware and Hudson Railroad are involved in these claims. Train No. 35 transported the officers to Montreal, while the southbound train from Montreal to the United States is Train No. 10. Train No. 35 has, throughout the period of these claims, left Rouses Point at about 4:30 p. m., and arrived in Montreal at about 5:45 p. m. Train No. 10 has left Montreal on schedules of 10:10 p. m. or 10:20 p. m., arriving in Rouses Point on schedules of 11:22 p. m. or 11:32 p. m.

3. (a) Two immigration officers are regularly assigned to conduct inspections on Delaware and Hudson Train No. 10. Their duties are performed during their regularly scheduled tours of duty, from 4 p. m. to 12 midnight. They travel from Rouses Point northbound to Montreal on Train No. 35 for the express purpose of catching Train No. 10 back to Rouses Point. There is usually an interval of 4 hours or more between the arrival in Montreal of Train No. 35 and the departure therefrom of Train No. 10. The officers board Train No. 10 when it is ready (usually several minutes prior to departure) and make their examinations of passengers en route to Rouses Point.

(b) Additional officers are assigned to assist the two regularly assigned officers when the southbound trains are expected to carry more passengers than usual. Each of the plaintiffs in this action is an immigration officer who has been so assigned as an extra and required to work outside (beyond) his regularly scheduled tour of duty.

4. (a) On each occasion of the assignment of extra officers to assist with inspections, the officers regularly assigned were paid for a regular tour of duty, i. e., from 4 p. m. to 12 midnight.

(b) Customs inspectors stationed at Rouses Point, who departed for Montreal on the same train as plaintiffs and who performed inspectional services on the southbound trains just as plaintiffs did, were paid overtime compensation beginning at 5 p. m. under the comparable Customs Service Act.

(c) On each occasion of the assignment of one of the plaintiffs as an extra officer for which claim is now made, the individual plaintiff has been paid overtime compensation under the provisions of the Act of March 2, 1931 (5 U.S.C. §

---

1. St. Albans, Vermont (station of plaintiff James W. Hudson), is likewise a designated port of entry for aliens arriving in the United States by railroad.

2. A similar agreement between the Immigration Service and the Central Vermont Railway, Inc., provides inspection while the train is en route between Montreal and St. Albans.

These agreements were in effect at all times material to this action.

The procedure (in effect along the Canadian border) avoids delay of trains at the ports of entry.

3. Similarly, the Central Vermont Railway furnished transportation for the officers from St. Albans, Vermont, to Montreal.

342c), for a period of time beginning 2 hours prior to the departure of Train No. 10 from Montreal and ending with the arrival of the train in Rouses Point or upon completion of inspection of passengers, whichever is later.

(d) Each of the plaintiffs stationed at Rouses Point[4] now claims the payment of overtime compensation under the act above cited for the period beginning at 5 p. m. and extending to the beginning of his "rollback" period (2 hours prior to train departure).[5]

(e) The parties have stipulated that the claim of plaintiff James W. Hudson (No. 3) is identical to the claims of the other plaintiffs except that (1) plaintiff Hudson was stationed at St. Albans, Vermont, and (2) the train designations for travel from St. Albans to Montreal and return vary accordingly.

5. (a) Prior to March 1, 1960, plaintiffs were paid overtime compensation under the Act of March 2, 1931, for services as extra inspectors for the full period from 5 p. m. until the time of train release in Rouses Point or St. Albans.[6]

(b) On February 29, 1960, the Assistant Regional Commissioner of the Immigration Service (in Burlington, Vermont) issued a directive to the District Director (in Buffalo, New York) inviting attention to "the well established rule that travel time is not compensable as overtime work," and directing payment to "overtime" inspectors of "extra compensation from the time they are ordered to board the [southbound] train * * * plus any allowable roll-back time up to two hours * * *."

(c) Plaintiffs' claims for the overtime compensation of which they were deprived by the foregoing directive were presented to and denied by the General Accounting Office.

6. The facts concerning plaintiffs' activities prior to departure of Train No. 10 from Montreal are as follows: When called for overtime services, plaintiffs reported to headquarters at Rouses Point at about 4 p. m. to obtain their working equipment, up date their alien "lookout" book, and familiarize themselves with current directives. On the northbound trip to Montreal, plaintiffs, like the regular immigration officers, were in uniform and were available to answer any inquiries by passengers or Canadian officials relative to immigration matters. United States forms collected by Canadian officials were also turned over to plaintiffs during this trip northbound.

7. After depositing their train bags at their office at the Montreal station, plaintiffs and the regular officers generally had dinner, and then returned to the office and made themselves available to preinspect any passengers entering the United States on Train No. 10 and to answer any inquiries. This advance inspection in the station shortened the processing time required on board train and, thus, may have avoided the detention of the train in Rouses Point, pending completion of inspection or, at least, shortened the time for such detention.

8. Train No. 35 was the only practical means of transportation upon which plaintiffs could rely to get them to Montreal in time to catch the southbound train back. It would not have been practical for plaintiffs to have driven there, since they would have had no way to get their cars back to Rouses Point.

9. (a) Plaintiffs were in the performance of their duties during the period of time after 5 p. m. on each of the days involved in this action and were entitled to recover overtime pay accordingly under the Act of March 2, 1931.

4. For a description of the claim of the plaintiff stationed at St. Albans, see finding 4(e), infra.

5. No claims are involved for overtime compensation under the 1931 act for services performed on Sundays or holidays.

6. The services performed after March 1, 1960, were the same as the services performed prior to that date.

(b) The parties have stipulated the following amounts of recovery due each plaintiff for the period extending from March 1, 1960, to June 15, 1965 (the date of completion of the trial):

| | | |
|---|---|---|
| 1. | Laurens L. DeLano | $403.48 |
| 2. | Samuel M. Dickson | 619.60 |
| 3. | James W. Hudson | 304.72 |
| 4. | Wilbur A. Jennings | 686.08 |
| 5. | William Kodl | 813.44 |
| 6. | Emil J. Mayer | 460.24 |
| 7. | R. W. McPheeters | 467.28 |
| 8. | Truman O. Murray | 368.80 |
| 9. | John J. O'Loughlin | 588.72 |
| 10. | Russell G. Pilger | 489.44 |
| 11. | Leonard Roth, Jr. | 156.76 |
| 12. | Wilfred C. Viens | 333.20 |

## CONCLUSION OF LAW

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, for the period extending from March 1, 1960, to June 15, 1965, in the following amounts:

| | | |
|---|---|---|
| 1. | Laurens L. DeLano | $403.48 |
| 2. | Samuel M. Dickson | 619.60 |
| 3. | James W. Hudson | 304.72 |
| 4. | Wilbur A. Jennings | 686.08 |
| 5. | William Kodl | 813.44 |
| 6. | Emil J. Mayer | 460.24 |
| 7. | R. W. McPheeters | 467.28 |
| 8. | Truman O. Murray | 368.80 |
| 9. | John J. O'Loughlin | 588.72 |
| 10. | Russell G. Pilger | 489.44 |
| 11. | Leonard Roth, Jr. | 156.76 |
| 12. | Wilfred C. Viens | 333.20 |

The parties may resolve before the commissioner the question of whether any additional amounts are due by reason of continuing claim. Therefore, judgment is entered for plaintiffs with the determination of the amounts of recovery reserved for further proceedings under Rule 47(c).